# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JOSE ACEVEDO, on behalf of J.A., a minor**
    **Plaintiff,**

    **v.**                                                   **Case No. 06-C-855**

**MICHAEL J. ASTRUE**
**Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Jose Acevedo, on behalf of his minor son J.A., seeks judicial review of the denial of J.A.'s application for supplemental security income ("SSI"). The Social Security Administration ("SSA") denied J.A.'s claim initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. When the Appeals Council denied plaintiff's request for review, the ALJ's decision became "final" for purposes of judicial review. See Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007).

## I. APPLICABLE LEGAL STANDARDS

SSI is available for the "disabled" children of low income parents. Keys v. Barnhart, 347 F.3d 990, 991 (7th Cir. 2003). In considering whether an adult is disabled, the SSA asks whether the claimant is unable, due to severe physical or mental impairments, to perform his or her past work or make the transition to other work in the national economy.[1] Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004). Because children seldom have work histories,

---

[1] If the claimant suffers from one of the presumptively disabling impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"), the SSA will find him disabled without inquiring into his ability to work.

the SSA has modified the test for determining whether a child-claimant is disabled. Keys, 347 F.3d at 992. Under the test for children, the SSA considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; and (3) if so, whether the impairment meets, equals or functionally equals an impairment listed in SSA regulations as being presumptively disabling. Giles, 483 F.3d at 486-87. In determining whether an impairment meets or equals a Listed impairment, the evaluation for a child is much the same as for an adult: the claimant must satisfy the specific criteria of the particular Listing. See Keys, 347 F.3d at 992; see also Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). If the child-claimant does not meet or equal a Listing, the ALJ must determine whether his impairment "results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a). The ALJ does this by evaluating the claimant's degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1). If the ALJ determines that the claimant has "marked" limitations in two domains or an "extreme" limitation in one domain, he must find the child disabled. § 416.926a(a); see also Giles, 483 F.3d at 487.

In the present case, plaintiff contends that the ALJ erred in (1) finding J.A.'s mental impairments non-severe and failing to consider whether such mental impairments met or equaled a Listing; (2) finding that J.A. did not meet Listing 114.07, congenital immune deficiency disease; (3) evaluating the credibility of the testimony supporting J.A.'s claim; and (4) considering the domains. The Commissioner acknowledges some deficiencies in the ALJ's decision, but contends that overall it is supported by substantial evidence and free of harmful

2

legal error. See Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004) (stating that judicial review in disability cases is limited to determining whether the final decision of the SSA is supported by substantial evidence and based on the proper legal criteria).

## II.  FACTS AND BACKGROUND

**A.  Medical Evidence**

The medical records submitted to the SSA indicate that J.A. suffered from an immune deficiency disorder, which caused fatigue and required monthly IVIG ("intravenous immunoglobulin") infusions; juvenile polyposis, which caused rectal bleeding and required colonoscopies; asthma, which caused coughing and shortness of breath, particularly with activity, and for which J.A. used medication and an inhaler; and recurrent sinus infections, for which he was given medication. (Tr. at 86-94; 101-54; 250-366; 414-30.) J.A. was also diagnosed with an adjustment disorder with mixed disturbance of emotion and conduct, evidenced by memory difficulty, poor attention and concentration, fear of dying and poor emotional control, with a GAF of 58,[2] for which he received counseling. (Tr. at 433-44.)

**B.  School Records**

According to his school records, J.A. struggled academically and was retained in the third grade. J.A.'s May 2003 (third grade) Individualized Education Program ("IEP") indicated that he was functioning at a first grade level in reading, late first grade level in written language and early second grade level in math. His work was at times late or incomplete, and he had difficulty listening and following directions. However, he participated in class discussions and

---

[2]GAF ("Global Assessment of Functioning") is a rating of a person's psychological, social and occupational functioning. Set up on a 0-100 scale, scores between 50 and 60 reflect an individual with moderate difficulty in functioning. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

3

his behavior was good. (Tr. at 189-91; 205.) The school nurse indicated that he would miss school on his infusion days but would not usually miss school due to fatigue or medication side effects. (Tr. at 192.) The IEP further indicated that J.A.'s previous teacher recommended a special education evaluation due to academic concerns. (Tr. at 193-94; 248-49.) According to the school psychologist, J.A.'s intellectual functioning measured within the average range, but he may have an information processing deficit in the area of expression. Rating scales completed by his classroom teacher indicated attention problems and learning problems, but all other indicators were age-appropriate. (Tr. at 195.) In the participant summary of findings section, the IEP indicated that J.A. had severe difficulties with information processing. (Tr. at 197.) The IEP team concluded that J.A. did not have a specific learning disability, but did have a health impairment – immune deficiency – which limited his strength, vitality and alertness. (Tr. at 200.) The IEP team concluded that J.A. required specially designed instruction to address delays in language arts and math. (Tr. at 201.) He was therefore scheduled for specially designed language arts intervention 1.5 hours per day in the special education classroom, with additional modifications in the regular classroom. (Tr. at 209-10.) However, J.A.'s parents apparently declined special education placement at that time. (Tr. at 399.)

J.A.'s 2003-04 report card indicated that he got Bs, Cs and Ds. (Tr. at 98; 236; 239.) In the comment section, his teacher indicated that J.A.'s reading ability was a concern, as was his ability to follow school rules. (Tr. at 99; 237; 240.) J.A.'s March 2004 progress report indicated that he was reading below grade level and needed to improve attentiveness and class conduct. (Tr. at 97.) Notations from April and June 2004 indicated that J.A. made progress in reading and math, but continued to have trouble following rules, respecting authority and staying on task. (Tr. at 96; 238; 241.)

4

J.A.'s 2004-05 report card indicated that he received mostly Cs and Ds for grades, but did well in art and music. (Tr. at 242.) In the comment section, his teacher indicated that J.A. participated enthusiastically in class but needed to use his time more effectively. (Tr. at 243.)

According to his May 2005 (fourth grade) IEP, J.A.'s intellectual functioning measured in the average range, but he appeared unmotivated, had low self-esteem and struggled with pain issues. (Tr. at 367-68.) Academically, he was reading at a third grade level and failing math and written language. He completed his work, but it was usually done incorrectly, and he had difficulty staying on task and following directions. He was absent an average of fifteen days per year, 19.5 in the then-current year. (Tr. at 369.) The school social worker expressed concern about J.A.'s fear of death and dying, and his parents reported an increase in his fears and temper tantrums. (Tr. at 372.) The school psychologist wrote that J.A.'s intellectual functioning was in the average range, but he scored in the low average range in reading and spelling. He generally exhibited a positive attitude, but his teacher expressed some concern about his ability to concentrate and follow directions. (Tr. at 376-77.) Because his low academic functioning did not match his average intellectual functioning, members of the IEP team expressed concerns about somatization and depression. (Tr. at 379-83.) The IEP team concluded that J.A.'s weak academic skills made it difficult for him to function full time in regular education and required specifically designed intervention in the areas of reading and written language. (Tr. at 385; 390.)

**C.    SSA Consultants**

After J.A. filed for SSI, the SSA arranged for him to be examined by Marc W. Zylstra, Ph.D. Plaintiff told Dr. Zylstra that J.A. was frequently fatigued and easily became ill related to his immune deficiency disorder. He further related that J.A. had an anger control problem,

5

cried easily and acted out in school. (Tr. at 155-56.) However, on mental status exam, Dr. Zylstra found J.A. to be pleasant, cooperative and cheerful. (Tr. at 158-59.) On testing, J.A. was found to be of average intelligence, with spelling and math scores in the average range, and reading scores in the low-average range. His overall scores did not indicate the presence of mental retardation or a learning disorder, and his ability to attend to task and concentrate during the testing appeared to be good. In summary, Dr. Zylstra saw no evidence of significant psychological problems and opined that J.A. appeared to be functioning largely at an age-appropriate level. (Tr. at 160-62.)

The SSA's reviewing state agency also engaged Irene Ibler, MD, and Michael Mandli, PhD, to complete a childhood disability evaluation form. Drs. Ibler and Mandli concluded, based on a review of then available records, that J.A. had severe impairments, but they did not meet, medically equal or functionally equal the Listings. (Tr. at 177-78.) They found that J.A. had no limitation in the domains of acquiring and using information, attending and completing tasks, interacting with others and caring for oneself, and less than marked limitations in moving about and manipulating objects and health and physical well-being. (Tr. at 179-81.) Mary Harkness, MD and Cathy Propper, PhD, completed a similar form for the SSA, finding no limitation in domains one through five, and less than marked limitations in domain six. (Tr. at 183-88.)

**D.    Hearing Testimony**

At the hearing before the ALJ, J.A. testified that he was eleven years old, in the fifth grade and getting pretty good grades in school. He further stated that he had not been punished for misbehavior. (Tr. at 452-53.) He testified that he usually walked to school, but his mother drove him if the weather was bad. (Tr. at 454.) He stated that he had problems

6

with some of his classmates, who said racist things to him, and which made him angry. (Tr. at 455.) He testified that he participated in physical education class but sometimes got chest pain because of his asthma. (Tr. at 456.) He stated that he performed chores around the house, such as washing dishes and folding clothes, and was able to attend to his own dressing and grooming. (Tr. at 458.) He stated that he felt drowsy for about thirty minutes after his IV treatments. (Tr. at 459.)

Plaintiff testified that J.A. was very emotional, with his demeanor changing from one minute to the next. He slammed doors, threw things and wet the bed three or four times per week. (Tr. at 463; 469.) He fought with his older brother every day. (Tr. at 466.) He had been seeing a psychiatrist, who recommended medication, twice a month, then once a month. (Tr. at 464.) The treatment was not helping, and J.A. did not want to continue with it. (Tr. at 464.) J.A. was afraid of death, perhaps due to the passing of an uncle – who had the same health problems as J.A. – at the age of twenty. (Tr. at 470.) Plaintiff testified that J.A. got along with his teachers but not some of his classmates. (Tr. at 461.) He stated that J.A. was in special classes for reading, math and spelling, and usually got Cs and Ds on his report card. (Tr. at 462.)

Plaintiff stated that after he received his IV treatment, J.A. slept for an hour or two, then became cranky. He also experienced chest tightness with physical activity and fatigue and pain in his legs when he tried to ride his bike. (Tr. at 465; 468-69.) He also suffered from recurrent croup, sinus problems, face swelling and bloody stools. (Tr. at 467-68.)

The ALJ summoned Dr. Albert Ogyjiosor, an internist, to testify as a medical expert ("ME") at the hearing. The ME testified that he reviewed the records in J.A.'s file, which revealed that J.A. suffered from an immune disorder and asthma. (Tr. at 450-51.) However,

7

he indicated that such conditions did not meet or equal a Listing, including Listing 114.07, as urged by J.A.'s attorney.[3] (Tr. at 451.) Listing 114.07 provides that an individual with hypogammaglobulinemia, like J.A., is disabled if he also has (1) documented, recurrent severe infections occurring three or more times within a five-month period; or (2) an associated disorder such as growth retardation, chronic lung disease, collagen disorder or tumor. 20 C.F.R. Pt. 404, App. 1, § 114.07. The ME testified that the record demonstrated none of these criteria. (Tr. at 471.) Regarding the six domains, the ME found no impairment in acquiring and using information, attending and completing tasks, less than marked limitation in interacting with others, no limitation in moving about and manipulating objects, no limitation in caring for oneself, and less than marked limitation in health and physical well-being. (Tr. at 471-72.)

On cross-examination, the ME acknowledged that J.A. has asthma but explained that he did not consider such a chronic lung disease based on the record; instead he described J.A.'s asthma as an acute disease that could be recurring. (Tr. at 473.) The ME further acknowledged that J.A. had juvenile polyposis, but because polyps are benign tumors, he concluded that plaintiff did not meet that criteria of the Listing. He opined that the "tumor" criteria in Listing 114.07 referred to malignancies, such as malignant lymphoma, Hogdkin's lymphoma or leukemia. He further seemed to opine that the tumor would have to cause the immune disease, and that there are some malignant tumors typically associated with hypochromic anemia. (Tr. at 474-75.) When asked where in the Listing he found such a limitation to malignant tumors, the ME stated: "It's medicine. There is no benign tumor that I know of that is associated with hypochromic anemia. I'm not talking about the listing." (Tr. at

---

[3]The ME referred to Listing 114.04 (Tr. at 451), however, as plaintiff's counsel indicated in her opening statement, the relevant Listing was 114.07 (Tr. at 449).

8

476.) He further opined that there was no correlation between J.A.'s immune disorder and his asthma or polyps. (Tr. at 477.)

When asked about his testimony regarding the domains, the ME stated that it was based primarily on J.A.'s physical rather than mental condition. He did not consider behavioral issues in his responses. (Tr. at 478.) He clarified that he found no organic problem that would interfere with J.A.'s ability to acquire and use information. (Tr. at 479.)

**E.   Post-Hearing Treating Source Report**

After the hearing, plaintiff's counsel submitted a questionnaire from Dr. Alfonso Martinez, J.A.'s treating specialist, pertaining to Listing 114.07. Dr. Martinez indicated that plaintiff suffered from hypogammaglobulinemia with the associated disorder of tumors in the form of juvenile polyps. (Tr. at 55.)

**F.   ALJ's Decision**

On March 22, 2006, the ALJ issued an unfavorable decision. Following the three-step procedure, the ALJ concluded that J.A. had not engaged in substantial gainful activity, had severe impairments – primary immunodeficiency syndrome, IgG deficiency, juvenile polyposis, and asthma – but those impairments did not meet or medically equal a Listed impairment. In making his step three finding, the ALJ relied on the testimony of the ME in concluding that J.A. did not meet Listing 114.07 because his tumors (polyps) were benign. (Tr. at 17.) Finally, the ALJ concluded that J.A.'s impairments did not functionally equal the Listings. (Tr. at 17.) In so finding, he concluded, relying in part on the testimony of the ME and the consultants' reports, that J.A. had less than marked or no limitations in each of the six domains. (Tr. at 18-23.) Accordingly, the ALJ found that J.A. was not disabled. (Tr. at 24.)

9

## III. DISCUSSION

**A.     Severity of J.A.'s Mental Impairment(s)**

Plaintiff first argues that the ALJ erred in finding that J.A. had no severe mental impairment. In support of his argument, he cites the records and reports of treating sources at the Sixteenth Street Behavioral Health Clinic, who diagnosed J.A. with an adjustment disorder with mixed disturbance of emotion and conduct, and a learning disability. (Tr. at 434.) On mental status exam, J.A. was found to have memory difficulty; poor attention, concentration, emotional control and insight/judgment; and preoccupation with death, with a GAF of 58. (Tr. at 441-43.) J.A. received counseling at the Sixteenth Street Clinic over the course of about five months in 2005. (Tr. at 432.)

The ALJ failed to discuss this substantial evidence of a severe mental impairment. Indeed, the ALJ made no specific finding on mental impairments in his decision, finding only physical impairments to be severe at step two. The Commissioner argues that any error in finding no severe mental impairment at step two was harmless because the ALJ continued with the three-step process and considered any mental limitations J.A. may have in evaluating the first, second and third domains (in which the ALJ found "less than marked" limitations). Cf. Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005) (stating that if the ALJ finds other severe impairments, continues on with the sequential evaluation process, considering all impairments, severe and non-severe, in setting RFC any error in finding a particular impairment non-severe at step two may be harmless). The ALJ did acknowledge his duty at step three to consider the cumulative effects of all impairments, even those that are not severe. (Tr. at 16.) Nevertheless, under the circumstances of this case, I cannot find the ALJ's step two error

10

harmless.

First, the ALJ failed to mention any of the Sixteenth Street Clinic evidence discussed above in evaluating the domains at step three. In particular, the evidence of J.A.'s poor memory, attention, concentration, emotional control and insight/judgment contained in those records appears to lend significant support to plaintiff's claim regarding the second domain. The ALJ in finding a less than marked impairment in that domain relied on school records and the report of the consultative psychological examiner. Perhaps the ALJ concluded that this evidence was more persuasive, but absent some discussion I cannot tell if the contrary evidence "'was not credited or simply ignored.'" Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984) (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)); see also Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected."); Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001) (stating that an ALJ may not ignore an entire line of evidence that is contrary to his findings). The fact that the ALJ found a less than marked impairment in several domains which invoke a claimant's ability to function mentally, based on consideration of some of the evidence, cannot excuse his failure to consider other evidence that might have led to a different conclusion. Further, the consultative examiner saw J.A. about a year prior to J.A.'s receipt of treatment at the Sixteenth Street Clinic; thus, he could not have taken this evidence into account in writing his report.

Second, the ALJ substantially relied on the state agency consultants' opinions in

11

evaluating the domains.[4]  However, these consultants never examined J.A. and did not have access to the treatment records discussed above, which post-date their reports.  See, e.g., Berrios-Vasquez v. Massanari, No. 00-CV-2713, 2001 U.S. Dist. LEXIS 11477, at *20-23 (E.D. Pa. May 10, 2001) (reversing where the ALJ failed to refer to treatment notes and relied on report of non-examining consultant who did not have access to entire record); cf. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004) ("The fact that these [state agency] physicians reviewed the entire record strengthens the weight of their conclusions.").  Further, the ALJ did not obtain an updated psychological opinion in light of the additional evidence from the Sixteenth Street Clinic.  See SSR 96-6p (stating that the ALJ must obtain an updated opinion from a medical expert when additional medical evidence is received that may change the state agency consultant's finding that the impairment is not equivalent in severity to a Listing); see also Barnett v. Barnhart, 381 F.3d 664, 670-71 (7th Cir. 2004) (reversing where ALJ failed to receive expert opinion on equivalence with Listing).  The ALJ summoned an ME to the hearing, but as an internal medicine specialist he had no expertise in the area of mental impairments and admittedly based his opinion on J.A.'s physical rather than mental condition.  (Tr. at 478-79.)  Thus, the ALJ could not reasonably rely on his opinion on this issue.  See 20 C.F.R. § 416.1016 (discussing limitations on what medical and psychological consultants may evaluate).[5]

---

[4]The ALJ cited and relied on the report from Drs. Harkness and Proper (Tr. at 19; 183-88), which was marked as exhibit 7F at the hearing.  He did not consider the report from Drs. Ibler and Mandli, marked as exhibit 6F.  (Tr. at 177-82.)  Thus, he ignored the conclusion in the latter report that J.A. had less than marked limitations in moving about and manipulating objects.  (See Tr. at 22; 179.)

[5]The Commissioner contends that the ALJ did not in any meaningful way rely on the opinions of the state agency consultants.  He points out that unlike the consultants, who found

12

Therefore, the matter must be remanded for reconsideration of the severity of J.A.'s mental impairments based on the entire record. The ALJ will also on remand have to consider the Listings of mental impairments based on the entire record.

**B.  Listing 114.07**

Plaintiff next argues that the ALJ erred in finding that J.A. did not meet Listing 114.07. That Listing covers congenital immune deficiency diseases and has the following criteria:

> A. Hypogammaglobulinemia or dysgammaglobulinemia, with:
>
> 1. Documented, recurrent severe infections occurring 3 or more times within a 5-month period; or
>
> 2. An associated disorder such as growth retardation, chronic lung disease, collagen disorder or tumor. Evaluate according to the appropriate body system listing.
>
> or
>
> B. Thymic dysplastic syndromes (such as Swiss, diGeorge).

20 C.F.R. Pt. 404, App. 1, § 114.07.

It is undisputed that J.A. suffers from hypogammaglobulinemia. However, the ALJ found that J.A. had none of the requisite associated disorders. While the evidence demonstrated that J.A. suffered from polyps (i.e., tumors), the ALJ agreed with the ME that the "tumor" referred to in the Listing had to be a malignant tumor, while J.A.'s polyps were benign. The ALJ noted that Listing 114.07 states that the associated disorder is to be evaluated under the appropriate

---

no limitations in five of six domains, the ALJ found less than marked limitations in four of six domains based on the entire record. However, it is clear that the ALJ used the opinions of the ME and the consultants as benchmarks – he compared his conclusions to their's regarding each of the six domains. (Tr. at 19-23.) Thus, the ALJ's decision does not support the Commissioner's argument. In any event, the ALJ's review of the "entire record" omitted the treating source records discussed in the text above. The Commissioner makes no argument that the ALJ could reasonably rely on the ME on mental impairment issues.

13

body system listing, which the ALJ concluded was Listing 113.00 – childhood neoplastic diseases, malignant. All of the tumors discussed in that Listing series are of the malignant variety. 20 C.F.R. Pt. 404, App. 1, §§ 113.00-.05.

At the hearing, the ME stated that his opinion on this issue was based on medicine, not a reading of the Listing. Specifically, he stated that benign tumors are not associated with anemia. (Tr. at 476.) He also stated that there was no correlation between J.A.'s immune disorder and his tumors or asthma. (Tr. at 477.) However, in a post-hearing report, treating source Dr. Martinez opined that J.A.'s polyps were an "associated disorder." (Tr. at 55.) The ALJ did not address Dr. Martinez's report.

It is not clear why the ALJ chose Listing 113.00 as "the appropriate body system listing." The ALJ stated his agreement with the ME, but the ME offered a medical not a legal opinion. Because Listing 113.00 pertains only to malignant neoplastic diseases, the ALJ's selection of it doomed J.A.'s claim under the Listings. Listing 114.07 does not by its terms require that the tumor be malignant; other Listings in the 114.00 series clearly state when the associated disorder must be malignant. See, e.g., 20 C.F.R. Pt. 404, App. 1, § 114.08(E). And, as plaintiff notes, there are other Listings for benign tumors. See, e.g., 20 C.F.R. Pt. 404, App. 1, §§ 11.00(B) & 111.00(E). Further, the ALJ's interpretation appears to make Listing 114.07 redundant. If a claimant must under Listing 114.07 demonstrate that his associated tumor meets the Listing 113.00 criteria, the fact that he also has hypogammaglobulinemia would be irrelevant; he would already meet a Listing independent of his immune deficiency.

The Commissioner notes that plaintiff fails to cite any authority for the proposition that 113.00 is not the "appropriate body system listing" for tumors, fails to advise the court what other Listing is appropriate, and fails to demonstrate any functional limitations from his tumors

14

(as is necessary under the non-malignant tumor Listings plaintiff does cite).[6] But the Commissioner fails to cite any authority for, or explain why, 113.00 is the appropriate Listing. More importantly, neither did the ALJ. Given the uncertainties discussed above, absent further explanation, I cannot uphold the ALJ's decision.[7] See, e.g., Giles, 483 F.3d at 487-88 (finding that the ALJ's lack of analysis of a child-claimant's impairments in conjunction with the Listings precluded the court from assessing the validity of his conclusion); Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings."); Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003) (reversing where the ALJ failed to provide meaningful analysis of child's claim under the Listings); Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (reversing where the ALJ failed to provide a bridge from the evidence to his conclusion on a child's Listing claim). Therefore, the decisions is reversed and remanded for re-evaluation of the Listings. If upon further evaluation and explanation the ALJ concludes that J.A. does not meet Listing 114.07, he must consider the issue of medical equivalence in light of the entire record and based on all of J.A.'s impairments. See 20 C.F.R. § 404.1526.

---

[6] I note that the record does contain evidence of symptoms associated with J.A.'s polyps, such as rectal bleeding and bloody stools. Cf. Tessitore v. Apfel, No. 97-2925, 1998 U.S. Dist. LEXIS 13889, at *3 (E.D. La. Sept. 3, 1998) (discussing criteria of Listing 5.06(A), chronic ulcerative or granulomatus colitis, which include recurrent bloody stools documented on repeated examinations and anemia manifested by hematocrit of 30 percent or less on repeated examinations).

[7] To the extent that the ME offered the medical opinion that J.A.'s polyps and asthma were not "associated" with his immune deficiency, which the Listing plainly seems to require, there is a dispute in the record that the ALJ failed to resolve. J.A.'s treating physician opined that J.A.'s tumors were associated with his immune deficiency, and the ALJ failed to mention this report. He must reconsider this issue on remand.

15

## C.     Credibility

Plaintiff further argues that the ALJ failed to properly evaluate the credibility of the testimony in support of J.A.'s claim. The sum of the ALJ's credibility analysis was as follows:

> After considering the evidence of record, <u>the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms</u>, but that <u>the statements concerning the intensity, duration and limiting effects of the claimant's symptoms are not entirely credible</u>.

(Tr. at 18, emphasis in original.)  This is insufficient.

Given his access to the witnesses and immersion in the case as a whole, the ALJ's conclusion as to credibility is generally afforded great deference in social security proceedings, see, e.g., Briscoe v. Barnhart, 425 F.3d 345, 354 (7th Cir. 2005); Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004), but the manner in which he reaches that conclusion is highly regulated, Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1027 (E.D. Wis. 2004). For example, the ALJ must comply with SSR 96-7p. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). That Ruling establishes a two-step process for evaluating the credibility of the claimant's testimony about symptoms such as pain, fatigue or weakness. Blom v. Barnhart, 363 F. Supp. 2d 1041, 1054 (E.D. Wis. 2005). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to function. Id. (citing SSR 96-7p).[8]  Second, if an impairment that could reasonably produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting

---

[8]In the present case, the ALJ concluded that J.A. had a medical condition that could produce his symptoms.

16

effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to function. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. Id. (citing SSR 96-7p). He "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

While SSR 96-7p and § 404.1529 do not require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination, the ALJ must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Blom, 363 F. Supp. 2d at 1055. "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p. Nor may the reasons for a credibility finding be implied. "Indeed, the cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); see also SSR 96-7p (requiring the ALJ's decision to include "specific reasons for the finding on credibility, supported by the evidence

17

in the case record").

The ALJ's bald statement that the testimony supporting J.A.'s claim was "not entirely credible" violated the clear command of SSR 96-7 and the cases cited above. Although the ALJ mentioned J.A. and plaintiff's testimony in evaluating the third through sixth domains, he provided no reasons for finding such testimony incredible. Thus, even if I were to comb the balance of the decision for credibility findings consistent with the SSR 96-7p factors, I am unable to find any.

The Commissioner concedes that the ALJ's analysis could have been more thoroughly articulated, but contends that plaintiff has failed to explain what aspects of the testimony, if accepted, would change the outcome. He argues that because the ALJ's decision was generally consistent with the testimony, remand is unnecessary. I cannot agree.

The ALJ skipped a great deal of testimony that seems contrary to his conclusion, including plaintiff's testimony that J.A. was emotional, afraid of death, slammed doors, threw things and wet the bed several times per week. The ALJ also skipped over the testimony and evidence that J.A. had been seeing a psychiatrist. The ALJ further omitted reference to the written reports J.A.'s parents prepared, which indicated that J.A. could not tie his shoes (Tr. at 66), struggled with finishing what he started and completing chores and homework (Tr. at 67), and needed repeated reminders to tend to his self-care (Tr. at 73). They wrote that he was not aware of his surroundings, including traffic, when walking or riding his bike, which created an unsafe situation. (Tr. at 73.) Thus, I cannot find the ALJ's violation of SSR 96-7p harmless.

Finally, contrary to the Commissioner's argument, the ALJ plainly did not find the testimony consistent with his conclusion; if he had, he would have found the testimony credible. See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is

18

enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). The matter must be remanded for re-evaluation of credibility as well.

**D.    Domains**

Finally, plaintiff argues that the ALJ erred in evaluating the domains. For many of the same reasons stated above, I agree that the matter must be remanded on this basis as well.

First, the ALJ did not consider the psychiatric treatment records from the Sixteenth Street Clinic or fully and properly consider the credibility of the testimony. He must do so on remand and re-evaluate the domains accordingly.[9] It may also be necessary for the ALJ to obtain an updated consultative medical opinion in light of this evidence, or to summon an ME qualified to render opinions on psychological issues to the new hearing.[10]

Second, the ALJ failed to consider all of the evidence pertaining to J.A.'s health and physical well-being. In his decision, the ALJ found a less than marked limitation in this domain due to the effects of J.A.'s immune deficiency and asthma. He noted that J.A. alleged no problems with physical activity except asthma, which caused chest pain about once per month, and that plaintiff testified that J.A. suffered abnormal breathing with physical activity, which he treated with an inhaler, and that the monthly infusions caused J.A. to sleep for an hour or two.

---

[9] I also note that the ALJ seemed to selectively cite the school records, which at times documented behavioral and attention problems. While the ALJ need not discuss every piece of evidence, and it is his job to weigh the evidence, on remand he should take a closer look at the school evidence contrary to his conclusions.

[10] As noted above, the ME who testified at J.A.'s hearing was not qualified to render an opinion on those issues.

19

(Tr. at 23.) The ALJ seemed not to appreciate the nature and extent of the monthly infusions, which took about three hours and required J.A. to miss a full day of school.[11] J.A. was absent from school nearly four weeks in 2005. (Tr. at 369.) The ALJ also failed to mention the periodic colonoscopies J.A. endured in order to address his juvenile polyposis, as well as the rectal bleeding and bloody stools accompanying that condition. (E.g., Tr. at 274-77; 315; 467-68.) Finally, the ALJ failed to mention J.A.'s recurrent sinusitis, face swelling, fatigue and headaches. (E.g., Tr. at 326; 329; 332; 333; 359; 360; 363; 467-68.)

Thus, the matter must be remanded for reconsideration of the domains, as well.

## IV. CONCLUSION

**THEREFORE, IT ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of May, 2007.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[11]On remand, the ALJ will also have to consider the relevance of J.A.'s monthly IV treatments in determining functional equivalence. See 20 C.F.R. § 416.926a(m)(3).